[S. F. No. 13440. In Bank.—June 29, 1929.]

CHARLES F. WHITMORE, Jr., et al., Petitioners, v. FREDA M. BROWN, as Tax Collector, etc., Respondent.

C. N. Lavers for Petitioners.

Lovett K. Fraser for Respondent.

Earl Warren, District Attorney of Alameda County, Frank M. Ogden, Assistant District Attorney, Agnes R. Polsdorfer and James H. Oakley, Deputies District Attorney of Alameda County, Preston Higgins, City Attorney of the City of Oakland, Homer Buckley, Deputy City Attorney of the City of Oakland, William J. Locke, City Attorney of the City of Alameda, Earl J. Sinclair, City Attorney of the City of Berkeley, Clark, Nichols & Eltse and George Clark, *Amici Curiae.*

PRESTON, J. — Original proceeding in mandate. The question recurs upon a general demurrer to the petition.

Petitioners are property owners in the city of Albany, a city operating under a freeholders' charter adopted on the seventeenth day of January, 1927. Respondent is the Tax Collector of said city. The territory comprising the city constitutes an elementary school district and at the same time also constitutes a high school district, each of which said districts is duly organized as such as provided by law.

The question presented by this proceeding is the validity of the tax levy made by the trustees of said city for the fiscal year 1928–1929, in so far as it comprises a levy of $3.35 per $100 of assessed valuation as and for a "fund for the maintenance, acquisition and improvement of schools in the City of Albany within the boundaries of the City of Albany as they now are, said money so raised must be expended within the boundaries of said City of Albany."

The charter of said city provides for a board of education, which, among other duties, shall annually "submit in writing to the Council a careful estimate of the whole amount of money to be received from the State and County for the support of the public schools in the City, together with a careful estimate of the amounts, specifying in detail the objects thereof, required from the City for the adequate support of the public schools for the ensuing year." The charter further provides: "The City Council shall include in and apportion from the annual tax levy the sum of not less than thirty-five cents on each one hundred dollars of assessed valuation to be paid into the school fund of the City." (Subd. g., sec. 38, Stats. 1927, p. 2326.)

Acting under this authority the board of education on August 17, 1928, submitted a report to the board of trustees to the effect that the Albany High School District was in need of a junior-senior high school to care for the educational needs of the children of the city and district; that no funds with which to purchase secondary school sites or to construct and equip secondary school buildings were available; that less than a year previously a bond issue had been defeated by a narrow margin and the board of trustees were therefore urgently requested to levy a tax of $3 on each $100 of assessed valuation in the City of Albany as provided by the charter of the city, the moneys thus raised to be used for the following purposes: Purchasing high school lots; building or purchasing or making alterations and additions to and insuring high school buildings and supplying them with furniture and necessary apparatus and improving high school grounds. Acting in part at least upon this recommendation, the city council on the seventeenth day of September, 1928, fixed a total tax rate of $4.59 on each $100 of assessed valuation, setting forth an estimated expenditure for the maintenance, acquisition and improvement of schools in the City of Albany, without any words to designate whether high schools or elementary schools, or both, were intended to be covered thereby, nor the amount to be used for maintenance for the ensuing year, of $186,157.93, apportioning to that purpose $3.35 of the rate fixed.

Petitioners, who owned real and personal property within the city, were assessed at the sum of $1,850, on which the

tax levy for said year at said rate was $84.92, fifty per cent of which would be declared delinquent upon the first Monday in December, 1928, with the remainder delinquent the last Monday in April, 1929. Petitioners paid the first installment of said taxes and thereafter tendered to respondent the sum of $14 in payment of the remainder claimed to be due as and for said taxes, said sum being estimated upon a school tax rate of .36 cents, and a total rate of $1.60, instead of a school tax rate of $3.35 and a total tax rate of $4.59 as fixed by the city council.

There is no question made as to the sufficiency of the tender if it should ultimately be held that the school tax levy was illegal. Respondent refused to comply with the demand that it accept said sum or to issue a receipt in full to petitioners and this proceeding followed. ▇ If these petitioners in fact tendered a sufficient amount to pay the tax legally due, this proceeding is a proper one to compel the issuance of an official receipt in full. (*Spring Valley Water Co.* v. *Planer,* 88 Cal. App. 170 [263 Pac. 323].)

We face at the outset a challenge to the power of a city operating under a freeholders' charter to levy to any extent a tax for school purposes. We are cited to the holding that the school system of the state is of general and state-wide concern and not a mere "municipal affair" as that term in the constitution (art. IX, sec. 6), is defined, and in support of this announcement freely made by the courts we are referred to such cases as the following: *Hancock* v. *Board of Education,* 140 Cal. 554 [74 Pac. 44]; *Kennedy* v. *Miller,* 97 Cal. 429 [32 Pac. 558]; *Los Angeles School Dist.* v. *Longden,* 148 Cal. 380, 383 [83 Pac. 246]; *Board of Education* v. *Davidson,* 190 Cal. 162 [210 Pac. 961]; *Esberg* v. *Badaracco,* 202 Cal. 110 [259 Pac. 730].

We are then cited to the provisions of article IX, section 6, of the constitution as amended in 1920 wherein a state high school fund for the support of day and evening secondary and technical schools is provided; where a county elementary school tax by the board of supervisors of each county is required; where the levy of a county high school tax by the board of supervisors is also required, and where also is found the following: "The public school system shall include day and evening elementary schools, and such day

and evening secondary schools, technical schools, kindergarten schools and normal schools or teachers' colleges, as may be established by the legislature, or by municipal or district authority. . . .

"The legislature shall provide for the levying of school district taxes by the board of supervisors of each county, and city and county, for the support of public elementary schools, secondary schools, technical schools, and kindergarten schools, or for any other public school purpose authorized by the legislature."

It is then stated that the "mode" prescribed is the "measure of power" when a provision of the constitution is to be construed (*People* v. *Gunn,* 85 Cal. 238, 248 [24 Pac. 718]), and from this line of reasoning the conclusion is adduced that only the board of supervisors of the county wherein the school district is located may levy a school tax and action of this kind by a municipality is forbidden. This deduction is then fortified, it is said, by reference to the provisions of the Political Code, sections 1612a, 1755, 1830–1837, inclusive, 1838, 1840, and perhaps other sections, all dealing with the subject of taxation for school purposes and providing that the levy of such taxes must be made by the board of supervisors. In this connection we are also cited to the case of *Chico H. S. Board* v. *Supervisors,* 118 Cal. 121 [50 Pac. 275], where it was held that city trustees, and not the board of supervisors, must levy school taxes in cities of the first to fifth classes, inclusive, organized and operated under the general Municipal Act of 1883 (Stats. 1883, p. 93), it being argued that the converse of the proposition here urged is there decided.

Again, it is asserted that unless municipalities can tax for other than municipal purposes, the levy here made must be in excess of the powers of the city. Lastly, it is contended that in the cases of *Esberg* v. *Badaracco, supra,* and *McDonald* v. *Richards,* 79 Cal. App. 1 [248 Pac. 1049], we have in effect held that the board of supervisors is the only body authorized to levy a district school tax.

At this juncture, however, we are met with the fact that in cities of the first to fifth classes, inclusive, organized under the general law, a school department is specially created with power in the city trustees to levy and collect

within specified limits, a tax for school purposes. This method in such city has been held to be exclusive (*Chico H. S. Board* v. *Supervisors, supra*).

In this connection also we must pause to note distinct evidences of the trend of our judicial decisions toward sustaining the power of cities, which desire to supplement the efforts of the state, counties and districts, to support, maintain and strengthen the public school system functioning within their borders. This is in line with the policy announced in our constitution as follows: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement." (Sec. 1, art. IX, Const.)

For example, in the cases of *In re Wetmore,* 99 Cal. 146 [33 Pac. 769], and *Law* v. *San Francisco,* 144 Cal. 384 [77 Pac. 1014], we find the power in municipalities to vote a bond issue for school purposes to be specifically upheld. Again in *Los Angeles School Dist.* v. *Longden, supra,* this power is reannounced and in explanation of the principle upon which the holding is based, it is said: "It thus may be taken as decided and settled that a city, as such, may bond itself for public-school purposes, and that this power extends to all cases where the object is in furtherance, and not in derogation of or in conflict with, the general school system established by the state. . . . What, therefore, the Wetmore case and the Law case decided was that the erection of schoolhouses within the corporate limits of a municipality was justly to be regarded as a municipal affair, and that the city, therefore, as such, could create a bonded indebtedness for such and like purposes, even though power to do the same thing was, under the general school system of the state, vested in a school district which, while occupying the same territory as that of the city, was still in point of law a distinct corporate entity. It follows, therefore, that the declaration of this court that the issuing of bonds for the building of schoolhouses by a city is a municipal affair constitutes in no sense a negation of the fact that another corporate entity—the school district—may, under the general school system of the state, do the same thing for the same purpose."

In short, the holding is that, notwithstanding the fact that the school system is of general concern and not strictly speaking a municipal affair, nevertheless it may be made such an affair by the city when acting in promotion and not in derogation of the legislative school plans and purposes of the state. For in said case of *Los Angeles School Dist.* v. *Longden, supra,* it is further said: "Moreover, it should be finally emphasized that the power of a municipality in this regard can only run current with, and never counter to, the general laws of the state touching the common-school system. To such general laws, if conflict arises, all municipal charters must be subservient."

We have also the case of *Malaley* v. *City of Marysville,* 37 Cal. App. 638 [174 Pac. 367], wherein the city charter of Marysville provided that the county superintendent should be *ex-officio* superintendent of its city schools and for such services should receive a salary of $50 per month. It was, however, provided by section 1617 of the Political Code that the powers and duties of the board of education included the employment and fixing of compensation of the city superintendent of schools; therefore, the contention was made that the board of education, and not the city, should compensate the county superintendent for his work. The court quoted at great length from *Los Angeles School Dist.* v. *Longden, supra,* and sustained the claim against the city for the salary of the county superintendent so fixed, using in part the following language: "The above excerpts are thus brought into this opinion, not because we feel prepared to hold that a superintendent of city public schools, or the matter of the appointment or employment of one, is a municipal affair, but because the principle thereby enunciated and approved and as applied to the situation considered in that case supports the proposition for which the respondent contends here, viz.: That, notwithstanding that they are different and separate or distinct corporate entities, a municipality and a school district, the territorial boundaries of which are the same as those of the city, may, if the legislature elects to give them the right to do so, exercise precisely the same identical power with respect to matters connected with and calculated to further the interests of the public school system, in so far as such city and school districts are concerned, and that, therefore, merely because

the Political Code, in its provisions establishing a system of common schools, confers upon the board of education of the city of Marysville power to employ a superintendent of city public schools, *non constat* that the provision of the charter of the city of Marysville has become a dead letter; that on the contrary, the provision being one whose object is and has always been in *furtherance* and not in *derogation* of the general school system, cannot be held to be inconsistent or in conflict, but perfectly consistent therewith.''

Indeed, in the case of *Esberg* v. *Badaracco, supra,* we find the following language: '' 'While statutes providing a general system of laws concerning the creation and conduct of common schools prevail over conflicting charter provisions, the charters may provide for matters not enumerated in the general laws and not in conflict therewith, including matters in furtherance of the purpose of the general laws of the state.' (18 Cal. Jur. 814, and cases cited.) ''

Again, in Political Code, section 1608, re-enacted in 1927 (Stats. 1927, p. 133), we find the powers conferred upon boards of school trustees and city boards of education to include the power to pay into the county treasury to be placed to the credit of the proper fund of their districts, all moneys received by and apportioned to them ''from taxes levied and collected under the authority of city councils for school purposes.'' This section apparently recognizes the power of city councils to levy taxes for school purposes under certain circumstances. And lastly, in said section 6, article IX, of the constitution above referred to, we find a clear intimation that schools may be established ''by the legislature, or by municipal or district authority.'' We should also contemplate the fact that charters promulgated under the constitution as freeholders' charters have all the dignity of ordinary statutes. (*Taylor* v. *Cole,* 201 Cal. 327 [257 Pac. 40] ; *Stern* v. *City Council of Berkeley,* 25 Cal. App. 685 [145 Pac. 167].)

In view of the foregoing principles thus briefly reviewed, we can reach no other conclusion than this: That as to ''district'' taxes for school purposes, the system provided by the constitution and general statutes is exclusive; that as to district taxes it was the intent of the framers of the amendment to provide a restricted and specific method for the raising of funds for school purposes, requir-

ing action first by the governing body of the district and the county superintendent of schools, completed by the action of the board of supervisors in levying a tax for such district. ■ But the word ''district'' so used cannot be held to include a municipality merely because the municipality and the district may occupy the same territory. Nor can we find in the above-quoted provision of the constitution or in the several statutory provisions in aid of it, anything which forbids a city, and particularly a city operating under a freeholders' charter, to aid the public school system in its midst by taxation of property therein located, where warrant so to do is found in the charter or other provision of the law. It would be an unnecessary crippling of our public school system, unwarranted by any rule of statutory or constitutional interpretation, to so hold.

Neither the case of *Esberg* v. *Badaracco, supra,* nor the case of *McDonald* v. *Richards, supra,* considered the question we have here before us. In the former case there was a conflict between the city charter and the state law as to which body had the ultimate right to fix the amount of money to be raised by taxation for school purposes and it was held that this power was lodged in the board of education and not in the supervisors. In the latter case the question for consideration was the validity of the provision of the Political Code (sec. 1612a), which authorizes the county auditor to levy the tax in the event of the failure of the board of supervisors to do so. We do not regard any statements made in either of said cases as foreclosing or curtailing to any extent whatever a free inquiry into and ruling upon the subject we have before us.

The provisions of the city charter of Albany above quoted are now to be considered. ■ The rule of construction here applicable has been cast in different language by the courts, all, however, to the effect that taxation by a municipality affects arbitrarily private property and at the same time is the exercise of a delegated power and that in both elements the rule applicable is that of strict construction. ''The power to tax when exercised under delegated authority by a municipal corporation is always subject to rigid scrutiny, first to determine whether it actually exists, and, second, to determine whether it has been exercised under the limitations imposed. . . . Since tax proceedings

are *in invitum,* tax laws are strictly construed in favor of the taxpayer and against the state, whether property is to be seized or the tax enforced by suit. Strict construction in such cases is reasonable, because presumptively the legislature has given in plain terms all the power intended to be exercised. A statute will not be held to have imposed a tax unless it is clear and explicit. . . . A tax statute is presumed to have been enacted in the light of such existing judicial decisions as have a direct bearing upon it." (24 Cal. Jur., pp. 27, 28.)

As said in *In re City and County of San Francisco,* 195 Cal. 426, 433, 434 [233 Pac. 965, 968]: " . . . the elementary rule still obtains that 'municipal corporations have only the powers expressly conferred and such as are necessarily incident to those expressly granted, or essential to the declared objects and purposes of the corporation.'" And in *Uhl* v. *Badaracco,* 199 Cal. 270, 282 [248 Pac. 917, 921]: "Language defining the powers of municipal corporations and grants thereto are to be strictly construed and any fair, reasonable doubt concerning the existence of a power is to be resolved against the corporation. Then again, as tax proceedings are *in invitum,* laws pertaining thereto are to be strictly construed in favor of the taxpayer and against the taxing power. (Citing cases.)" (See, also, *San Christina etc. Co.* v. *San Francisco,* 167 Cal. 762, 771 [52 L. R. A. (N. S.) 676, 141 Pac. 384]; *Estate of Potter,* 188 Cal. 55, 64, 65 [204 Pac. 826].)

■ The charter allows the levy of the tax for the "support" of public schools "for the ensuing year." The words "support" and "maintenance" are convertible terms in the scheme of the Political Code respecting public schools. For example, referring to high schools "maintaining the high school" is provided for in section 1756 and in sections 1760 and 1761 the word "support" is found used to convey the same meaning. Again, in section 1840 we have the word "maintenance" used in the same connection. We also find the significant fact that purchasing lots, building buildings, making permanent improvements and such like outlay is not included under the head of "maintenance" or "support." (See Pol. Code, secs. 1755, 1830, 1838 and 1840.)

It is also to be noted that taxation for building purposes comes under a different limit from taxation for support or

maintenance. (See Pol. Code, secs. 1755, 1838, 1839.) Lastly, in said section 1830 we find the two subjects, maintenance and building purposes, carefully distinguished and provision for the calling of an election to vote a tax for the one or the other.

The estimate prepared by the board of education in the case before us called for taxation at the rate of $3 for the following purposes: "For purchasing high school lots; for building or purchasing one or more high school buildings; for making alterations and additions to high school buildings; for insuring high school buildings; for supplying high school buildings with furniture and necessary apparatus; and for improving high school grounds."

The budget and levy was made for the following purposes: "Fund for the maintenance, acquisition and improvement of schools in the City of Albany within the boundaries of the City of Albany as they now are, said money so raised must be expended within the boundaries of the City of Albany."

Giving, as we must and do, the word "support" the meaning found in the code, we arrive at the conclusion that the item of $3 for school building purposes is unwarranted by the charter and for that reason is an illegal and void element in said tax levy and that the tax rate should be reduced by this amount.

The conclusions which we have thus arrived at are not intended, however, to be given such a narrowness of application as to wholly forbid the application of school moneys derived from taxation to such uses as that of making those ordinary repairs in existing school structures as are required for their adequate use during the current year, or as are by such use made necessary for like uses in the succeeding year; nor to the emergency provision of such structures, temporary in character, as the immediate needs of the department require during any particular period. But the erection of such permanent buildings as are contemplated by this tax cannot be brought by any rational interpretation within the otherwise limited meaning of the word "support."

Let the peremptory writ issue.

Waste, C. J., Richards, J., Seawell, J., and Curtis, J., concurred.